## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **KATHLEEN P. DUCRE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **VS.** | ) | **Civil Action No.  SA-04-CA-835-XR** |
| | ) | |
| **SBC-SOUTHWESTERN BELL, AND** | ) | |
| **SEDGWICK CLAIMS MANAGEMENT** | ) | |
| **SERVICES, INC.** | ) | |
| | ) | |
| **Defendants.** | | |

## ORDER

On this date, the Court considered Defendants' motion for summary judgment, Plaintiff's motion for summary judgment, Defendants' motion to strike evidence attached to Plaintiff's motion for summary judgment, and Defendants' motion to strike evidence attached to Plaintiff's reply to Defendant's response to Plaintiff's motion for summary judgment. For the reasons discussed below, Plaintiff's motion for summary judgment is GRANTED (Docket No. 43), and Defendants' motion for summary judgment is DENIED (Docket No. 38). Defendants' motion to strike evidence attached to Plaintiff's reply (Docket No. 56) and Defendants' motion to strike evidence attached to Plaintiff's motion for summary judgment (Docket No. 49) are DISMISSED AS MOOT. The Court concludes that the Administrator's factual findings relating to its denial of Plaintiff's claim for short-term disability benefits constituted an abuse of discretion. Plaintiff's motion for summary judgment is granted as to her application for short-term disability benefits only. Plaintiff is ORDERED to submit additional briefing on damages and attorney's fees by **January 29, 2007.** The remaining deadlines contained in the Court's Scheduling Order are VACATED. Defendant should respond to this

-1-

briefing within eleven days of service.  *See* Local Rule CV-7(d).  The Court will enter judgment on

a separate document pursuant to Rule 58 after considering this additional briefing.

## I. Factual and Procedural Background

**A.      Uncontested Facts**

Plaintiff Kathleen P. Ducre ("Ducre") sued Defendants SBC-Southwestern Bell and

Sedgwick Claims Management Services, Inc. ("SBC" and "Sedgwick") for wrongful denial of short-

term disability benefits pursuant to ERISA, 29 U.S.C. § 1132(a)(1)(B).  AT&T Inc. ("AT&T),

formerly SBC Communications, Inc., contracted with Sedgwick, an independent thirty-party

administrator, to administer claims under the AT&T Disability Income Plan ("Plan").  The Plan is

self-insured by AT&T.  Sedgwick does not play any role in funding or budgeting for payment of

claims, and Sedgwick is not an affiliate of the Plan.  AT&T contracted with Sedgwick to process

disability claims, review medical records, request additional medical documentation to support the

claims, and ultimately recommend acceptance or denial of disability benefits claims.  AT&T

Integrated Disability Service Center, formerly known as the SBC Medical Absence &

Accommodation Resource Team ("SMAART"), is a team of approximately 200 Sedgwick

employees who administer claims for employees of AT&T affiliates and subsidiaries, including

Southwestern Bell Telephone, L.P., the entity that employed Ducre.  AT&T does not have any input

on short-term or long-term disability applications.

The terms of the Plan are outlined in the Summary Plan Description ("SPD").  To be eligible

for short-term disability benefits ("STD"), a claimant must establish that she is "Totally Disabled,"

as defined by the Plan.  The Plan defines "Totally Disabled," for purposes of STD, in the following

manner:

> With regard to short-term disability, that because of illness or injury, an Employee is unable to perform all of the essential functions of his job or another available job assigned by the Participating Company with the same full- or part-time classification for which the Employee is qualified.

The Plan delegates authority to decide whether an employee is entitled to receive benefits to the Claims Administrator. In particular, the Plan provides that "the decision of the Committee or Claims Administrator . . . shall be final and conclusive and shall not be subject to further review." At the time that Ducre submitted her claims, Sedgwick was the Claims Administrator.

Ducre worked for Southwestern Bell for over 28 years prior to the submission of her claim for STD benefits. Ducre was employed as a customer service technician. Her job description was as follows:

> Performs installation, testing and maintenance operations on pole line plant, cable sheath, conductors and terminations, service wire, carrier, power and telephone equipment and associated wiring, locates and corrects faults in such equipment and wiring; removes and rearranges cross connections on cable plant and on distributing frames when required; prepares, records, and reports as necessary; handles other generally associated operations and work assignments.

General essential functions of her job, which are normally required, include, *inter alia*: (1) using sophisticated test equipment, measuring devices, meters and hand tools in analyzing, adjusting, installing, wiring, repairing, maintaining and testing communications services, facilities and associated equipment; (2) reviewing and interpreting work orders, circuit diagrams, company practices, and other related work documents; (3) placing or digging up buried cable and service wire relative to installation or repair activity; (4) working with lead cable, core filled cable and chemical compounds; (5) moving and/or lifting material such as ladders, tools and test sets weighing up to a maximum of 150 pounds; (6) climbing step and non-step poles to a working height of a minimum of 18 feet and/or climbing up ladders and works aloft with hand tools; (7) doing work involving a

-3-

lot of kneeling, stooping, crouching, crawling or other uncomfortable positions; and (8) working independently with little supervision.

Under the Plan, Ducre was entitled to 52 weeks of STD benefits if she was found to be "Totally Disabled," as defined by the Plan.  Based on her years of service, she would be entitled to a benefit amount of 100% of pre-disability pay for the entire 52-week STD period.

As of December 22, 2003, Ducre claimed that she could no longer work due to major depression, anxiety, and fatigue.  She received a psychiatric evaluation and treatment plan from the Laurel Ridge Hospital, completed by her Psychiatrist, Shyamala Rao, M.D., where she was treated in a day treatment program (9 a.m. to 3 p.m.) from December 23, 2003 to January 9, 2004.  In her psychiatric evaluation and initial treatment plan, Ducre's chief complaint was, "I can't go on."  She was referred to Laurel Ridge by her therapist, Mary Ann Harris.   The evaluation stated that Ducre was "very depressed, anxious, little sleep, little energy, overwhelmed and not able to function at home and at work."  The psychiatric review of symptoms for her depression included agitation, anorexia, insomnia, poor concentration, worthlessness/guilty feelings, dysphoria, and irritability. She was manic and impulsive.  She displayed inattention, distractability, and pressure of speech.  She appeared distressed, agitated, anxious, severely depressed, with blunted affect.  Her insight and reliability were categorized as poor.  Her diagnostic impression was major depressive disorder, severe; bipolar disorder; hypothyroidism; and sleep apnea.  Ducre's global assessment of functioning ("GAF") was 30 at intake and 35 at discharge from Laurel Ridge.  A GAF between 21 and 30 means that an individual's behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas.  A GAF between 31 and 40 means that there is some impairment in reality testing or communication or major

impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.[1] Ducre was discharged on January 9, 2004 and was instructed to see her therapist, Mary Ann Harris, weekly, to see Dr. Rao on January 19, 2004, and to stay off work until February 1, 2004. Ducre's final diagnosis from Laurel Ridge was major depressive disorder, bipolar disorder, and hypothyroidism.

Mr. Dudley Farmer was the SMAART medical case manager who initially handled Ducre's claim. Ducre was awarded STD benefits from December 29, 2003 until April 26, 2004. Throughout this period, Farmer was in contact with Ducre's medical care providers, which included Dr. Shyamala Rao, M.D. ("Rao"), Ducre's treating physician, and Mary Ann Harris, L.P.C. ("Harris"), Ducre's therapist. Additionally, Farmer requested and reviewed medical records that were sent to SMAART to support Ducre's claim for benefits. Throughout this time period, Farmer extended approval of benefits for Ducre on five occasions, each time after reviewing additional medical documentation submitted by Ducre and/or her health care providers in support of her disability claim. Finally, on April 27, 2004, Farmer determined that, based on the medical documentation and the opinion of a physician advisor, Ducre's claim did not qualify for continued payment of STD benefits.

Following her discharge from Laurel Ridge, the medical records submitted to SMAART indicate that Ducre continued to see Harris and Rao on a periodic basis. From January through April, the medical information submitted by Harris and Rao stated that Ducre was struggling with everyday life; needed help from others; exhibited poor hygiene; had impaired short term memory;

---

[1]Although the Court may not normally look beyond the administrative record when evaluating ERISA claims, the Court may refer to extrinsic information to explain medical terminology within the record. *See Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d at 299. Global Assessment of Functioning (GAF) Scale, http://www.bsu.edu/csh/ssrc/media/pdf/gafpage.pdf (Citing DSM-IV-TR).

-5-

at times could not perform activities of daily living ("ADLs"); had mood swings and concentration difficulties; was agitated, depressed and impulsive; was not able to problem solve, was disorganized; and was easily overwhelmed.  Rao indicated that, based on these factors, Ducre was precluded from returning to work as a customer service technician.  Ducre was prescribed various medications to treat these symptoms. Harris and Rao repeatedly advised that Ducre was not able to return to work.

Beginning on January 27, 2004, Farmer began attempting to contact Rao in order to determine whether Ducre could perform a job sedentary in nature for at least 4 hours a day during the period when Rao stated Ducre could not return to her duties as a customer service technician. On February 3, 2004, Farmer spoke with Harris regarding these issues, and she indicated that Ducre was not able to return to work, even in a sedentary job as described above.  Farmer again inquired of Rao on March 30, 2004 as to whether Ducre could return to work in a sedentary job, but received no response.  On April 5,2004, Farmer set up a physician advisor review in the form of a telephone conference between Harris and SMAART's physician advisor, Dr. Atique Khan ("Khan").

On April 8, 2004, the physician advisor review was conducted. Khan reviewed Ducre's file and spoke with Harris regarding Ducre's disability. Khan's notes indicate that Ducre was described as having symptoms of anxiety and depression that were not controllable.  Ducre had been prescribed various medications and was then currently taking Depakote and Topamax.  Ducre was still experiencing crying spells and problems with ADLs and short term memory. Khan stated that Ducre's stressors were described to be job-related and also some family issues, which triggered her post traumatic stress disorder ("PTSD") symptoms. Based on his brief telephone conversation with Harris, Khan concluded that Ducre's PTSD trauma was that her husband, who was also a former SBC employee, had applied for STD and was later terminated.  Ducre was said to be in fear that she

may also be terminated.   Khan noted that Ducre had been through inpatient and partial hospitalization programs and was currently in individual therapy on a weekly basis.

Khan further noted that Ducre was said to be in a constant fear of work.  When Khan inquired as to what was precluding Ducre from returning to work, Harris stated that Ducre wanted to go to work but feared the possibility of being terminated, like her husband.  Khan concluded that Ducre had received adequate treatment for her underlying psychiatric symptoms with inpatient and day programs and was currently on a maintenance treatment plan of individual therapy and medication. Khan further determined that the main reason Ducre was not able to work was her subjective fear of being fired at work, which was not a good enough reason to extend her psychiatric disability. Therefore, Khan found that the observational data presented did not support severity of impairment or significant limitation of functioning.  Based on these findings, Ducre was notified by Farmer via telephone on April 13, 2004, that her benefits would not be extended past April 18, 2004, but she was still entitled to submit additional medical information, which would be reviewed.

On April 19, 2004, Farmer received an undated letter from Rao stating that Rao was not returning Ducre to work due to her medical condition of major depressive disorder, generalized anxiety disorder and not being stabilized.  Rao reiterated that Ducre's concentration and short term memory were impaired, she was unable to perform ADLs and that her family members had to accompany her to public places. The letter further stated that if she was returned to work, the probability of decomposition was extremely high and there was a possibility of additional hospitalization if returned to work. Farmer extended Ducre's benefits until April 26, 2004, in order to allow him sufficient time to do the following: (1) contact Rao; (2) inform Rao of the report from Harris indicating that Ducre's main fear was being terminated; (3) determine if being terminated was,

in fact, Ducre's main fear; (4) determine when Rao last saw Ducre before writing the undated note; and (5) determine how Ducre presented herself at the last office visit. After several unsuccessful attempts to speak with Rao directly regarding these items, Farmer was provided with the date of Ducre's last office visit, which was March 4, 2004, and was informed by Rao's office that there was no additional updated information at that time.

Ducre's claim for STD was denied effective April 26, 2004 and a letter explaining the denial was sent to Ducre by Farmer on April 27, 2004. The denial cited to the definition of total disability discussed previously. The denial was based on the following medical documentation: (1) the undated letter submitted on April 19, 2004, which stated that Rao was not returning Ducre to work due to her medical condition of major depressive disorder and generalized anxiety disorder; (2) medical documentation forwarded by Rao on April 19, 2004, which were duplicates of information already provided; (3) two unsuccessful attempts to talk to Rao on April 22, 2004; (4) the fact that Ducre's last office visit with Rao had been on March 4, 2004 and that Rao had no additional information to submit; (5) Khan's telephone conference with Harris wherein Ducre's stressors were identified as job-related, family issues, and Ducre's continued fear of losing her job; and (6) the medical records submitted by Rao. Based on these factors, Farmer determined that the submitted medical documentation did not support severity of impairment or significant limitation of functioning to perform the essential functions of the job. Further, Farmer found that clinical information did not document a severity of Ducre's condition that supported her inability to perform her occupation of Customer Service Technician from April 26, 2004 through her return to work.

On April 28, 3004, Ducre appealed the denial of her benefits. The appeal was reviewed by Angela Molina ("Molina"), an Appeals Specialist employed by Sedgwick in the SMAART Quality

Review Unit.  Molina reviewed the claim file, the initial denial, and all additional medical records submitted by Ducre and/or her health care providers throughout the appeals process.  Molina also advised Ducre of the applicable deadlines for handling the appeal, when medical documentation would have to be received in order to be considered, that Ducre could submit any additional medical documentation that she wanted to be considered, and that the deadline could be tolled for 15 days to allow sufficient time for Ducre to submit additional documentation. Ducre did request that the deadline be tolled; therefore, all medical documentation to be considered on appeal was required to be submitted to SMAART on or before June 1, 2004.

Additional medical documentation was submitted by Rao advising Molina that the Plaintiff continued to be disabled from working as result of her severe depression and anxiety. In Dr. Rao's progress note of April 29, 2004, which was faxed to the Administrator on that same date, Dr. Rao's clinical observations were that the Plaintiff was overwhelmed, depressed, crying, not benefitting from therapy or medications, agitated, and exhibiting thought processes that were disorganized.  In that same progress note Dr. Rao indicated her diagnoses of the Plaintiff by using the diagnostic codes established by the American Psychiatric Association in the Diagnostic and Statistical Manua1 of Mental Disorders ("DSM-IV-TR"), indicating that the Plaintiff was suffering from Major Depressive Disorder, Recurrent, Severe Without Psychotic Features (the diagnostic code in the DSM-IV-TR manual for this diagnosis is 296.33), possible Bipolar Disorder (the diagnostic code is 296.89), and Generalized Anxiety Disorder (the diagnostic code is 300.02).[2]

On May 18, 2004, Ms. Molina received additional medical records from Dr. Rao in support

---

[2]This evidence, although extrinsic to the administrative record, is permitted as its sole purpose is to explain medical terminology within the record. *See Vega*, 188 F.3d at 299.

of the Plaintiff's administrative appeal, which included a note from May 17, 2004 from Dr. Rao along with Dr. Rao's progress notes from April 29, 2004, March 4, 2004, February 12, 2004, and January 19, 2004. In her note of May 17, 2004, Dr. Rao indicated that Ducre's level of functionality was poor, her ability to perform work and daily activities was poor, and indicated that the specifics regarding her functionality were contained within her progress notes. In her notes, she indicated that the Plaintiff was to see therapist, Mary Ann Harris, between visits.

On May 24, 2004, Molina received additional medical documents from Rao, which included a letter dated April 22, 2004, a handwritten note from Rao dated May 24, 2004, and progress notes from an office visit dated May 24, 2004. In the letter dated April 22, 2004, Dr. Rao described Ducre's condition and prognosis as follows:

> I am not returning Kathleen Ducre to work due to her medical condition of major depressive disorder and generalized anxiety disorder not being stabilized. Mrs. Ducre currently is not able to do her activities of daily living as bathing, eating, sleeping, plus her concentration is severely impaired. Her short-term memory is extremely poor and she has to have family members accompany her to public places and assist her in housecleaning activities. If Mrs. Ducre is returned to work the probability of decompensation is extremely high and there is possibility of additional hospitalization if she is returned to work. Mrs. Ducre is covered under the American Disability Act ("ADA"). It is against medical advice for Mrs. Ducre to return to work.

In the handwritten note dated May 24, 2004, Dr. Rao indicated, among other things, that she was extending the Plaintiff's disability from May 31, 2004 to December 31, 2004, with an anticipated return to work date of January 1, 2005, and that the Plaintiff should continue to see Mary Ann Harris (her therapist) on a weekly basis and should see her (Dr. Rao) every 3 to 4 weeks.

By May 25, 2004, Molina was informed by Ducre that all medical information had been submitted and that the appeal could proceed to the next step in the process. Therefore, as part of her final review, Molina forwarded Ducre's file for an Independent Physician Advisor ("IPA") Review

by Robert N. Polsky, M.D., a board certified psychiatrist. Dr. Polsky reviewed the medical information and claim file for Ducre, as well as her job description, and determined that Ducre was not disabled from her regular job. Specifically, Dr. Polsky found that Rao's reports that Ducre was completely unable to perform her ADLs such as bathing, eating, dressing, etc, were inconsistent with the frequency with which Ducre was being treated. Further, Dr. Polsky noted that the objective findings supported the fact that Ducre was not suicidal, parasuicidal, or psychotic. Dr. Polsky also noted that there were no formal mental status examination findings of an objective nature that would substantiate problems claimed with memory, cognition or concentration. Accordingly, Dr. Polsky found that from a psychiatric perspective, and based on the available information, Ducre was not disabled from her regular job. Dr. Polsky submitted his report to Molina on June 2, 2004.

Based on all submitted materials and information regarding the denial of STD by SMAART, in addition to the report by the independent physician advisor, Molina denied Ducre's claim for STD benefits on appeal. In accordance with the Plan, Molina sent Ducre a letter by certified mail, dated June 3, 2004, summarizing the records that she reviewed and detailing her reason for denying the appeal.

In addition to the written notification, on June 3,2004 Ms. Molina also notified the Plaintiff by telephone that her claim had been denied. The Plaintiff asked why her appeal had been denied and in response Molina reviewed the IPA report with her. Ducre requested the identity of the IPA, but Ms. Molina advised her that she needed to request her claim file in writing and upon receipt of her file she could discover the identity of the consultant. On that same day Ms. Ducre called Ms. Molina and advised that she had information from the Texas Rehabilitation Commission. Ms. Molina responded by advising Plaintiff that her appeal had been completed.

-11-

On June 7, 2004, SMAART received an additional progress note from Dr. Rao, also dated June 7, 2004, indicating that the Plaintiff had brought Dr. Rao the psychological testing results from tests that were performed on the Plaintiff on March 30, 2004, and also indicating that Ducre continued to be severely depressed and was again being referred to a partial hospital program due to her continued mental illness. This progress note was returned to the Plaintiff on June 9, 2004, with a letter informing Ducre that the decision on June 3, 2004 was final and the claim was not subject to further review.

**B.    Defendants' Summary Judgment Arguments**

Defendants argue that Sedgwick thoroughly reviewed Ducre's medical information and that multiple levels of review were conducted. Specifically, Claims Manager Dudley Farmer was in continuous contact with Ducre, her doctor, Rao, and her therapist, Harris. Farmer regularly reviewed the medical records supplied to SMAART by Ducre's health care providers. Additionally, a physician advisor, Dr. Atique Khan, reviewed Ducre's medical records and spoke with therapist Harris on the telephone. Following this conversation, Khan believed that the main issue precluding Ducre from returning to work was her fear that she would be terminated. Khan determined that Ducre had received adequate treatment for her underlying psychiatric symptoms and that the main reason Ducre could not return to work was her subjective belief that she would be terminated. Khan further determined that this was not a sufficient reason for Ducre to remain out on a continued disability and that observational data presented did not support severity of impairment or significant limitation of functioning.

Defendants further argue that following this initial denial, additional medical information was reviewed by Appeals Specialist Angela Molina and Independent Physician Advisor, Robert Polsky,

M.D.  The medical information submitted to support Ducre's claim during the appeal stage was almost identical in substance to the medical records submitted to Farmer. Defendant argues that a Plan Administrator, such as Sedgwick, may give consideration to and may rely on an Independent Medical Examination, even when the conclusions of the Independent Examiner differ from those of plaintiff's treating physician.

The ERISA provision which mandates that the administrator provide a full and fair review is 29 U.S.C. § 1133(2), which provides that every benefit plan shall "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." Challenges to ERISA procedures are evaluated under the substantial compliance standard. Defendant argues that Ducre had ample opportunity to submit medical documentation to support her claim.

## C.    Plaintiff's Summary Judgment Arguments

Plaintiff argues that the Administrator's plan interpretation was an abuse of discretion. Plaintiff claims that Dr. Polsky and the Plan relied on an excessively narrow  interpretation of total disability—that an employee is not disabled from working due to a mental condition unless he or she is suicidal, homicidal, or psychotic.  Plaintiff argues that this interpretation of "Total Disability" is not a fair and reasonable reading of the disability provision at issue.  The Plan definition does not limit mental illness disability to those who are suicidal, homicidal, parasuicidal, or psychotic. The Administrator's constricted and abstract interpretation of the Plan, in regards to the Plaintiff and others with mental illness, is contradicted by the plain language of the Plan.

Plaintiff also argues that the Administrator violated a number of ERISA regulations in reviewing the claim.  Because the Administrator closed the "full and fair" review of the Plaintiff's

claim when it issued the adverse benefit determination on June 3, 2004, this failure to identify the physician consultant, Dr. Polsky, was a breach of the minimum claim procedures of ERISA, which require that during the review process, the Administrator provide for the identification of medical or vocational experts whose advice was obtained on behalf of the plan in connection with a claimant's adverse benefit determination, without regard to whether the advice was relied upon in making the benefit determination. Disclosure of the medical consultant after the claim has been closed is meaningless, since any opportunity for further review, investigation, and/or rebuttal by the claimant or her treating physicians.

Plaintiff argues that the second procedural violation occurred when the Administrator refused to give the Plaintiff an opportunity to produce information relevant to her claim and directly responsive to the bases of denial of her appeal.  On June 3, 2004, the Plaintiff advised Ms. Molina that she had received information from the Texas Rehabilitation Commission, where she had been sent by her therapist, regarding her disability.  In response, Ms. Molina advised her that her appeal had been completed.

Plaintiff argues that the third procedural violation was a failure to provide a "full and fair" review of the specific reasons for the Administrator's denial.  Ultimately, the Administrator's specific reasons for terminating benefits were that Ducre was not suicidal, homicidal, parasuicidal, or psychotic, and that the mental status examinations of Dr. Rao were insufficient to substantiate impairments in memory, concentration, or cognition.  Plaintiff argues that Ducre was never given an opportunity for meaningful review of these specific reasons, as required by 29 U.S.C. 1133 and the accompanying regulations. Ducre claims she was ambushed with Dr. Polsky's opinions, first received by the Administrator a day before the appeal was closed, because she and her treating

physician never having an opportunity to address them.

Finally, Plaintiff argues that the Administrator's factual findings were an abuse of discretion. Plaintiff strongly contests Dr. Polsky's statement that there are no formal mental status examinations of an objective nature that would substantiate with problems claimed with memory, cognition, or concentration. Plaintiff argues that Dr. Rao's mental status examinations as documented in her progress notes, where she provides the patient's subjective complaints (labeled "subjective" in her notes), her clinical observations (labeled "observations"), diagnoses (labeled "assessment"), plan, and medications, substantiate Ducre's severe problems with memory, cognition, or concentration. Plaintiff stresses that her symptoms must be considered in conjunction with the potential hazards of her job. Plaintiff argues that Dr. Polsky provides no evidence as to how Mrs. Ducre, who is reported by her treating psychiatrist on April 22, 2004 as having trouble with activities of daily living such as bathing, eating, and sleeping, with severely impaired concentration, can safely perform the essential functions of her job as of April 26, 2004.

Plaintiff argues that Dr. Polsky's expert report is seriously flawed. Plaintiff notes that she was in a partial hospital program from December 23, 2003 to January 9, 2004, yet Dr. Polsky states that her lack of treatment in a partial hospital program is part of the reason he believes Dr. Rao is exaggerating her condition. Secondly, he indicates that he has no idea how frequently the therapist is seeing Ducre, but he suggests that the frequency which Dr. Rao is seeing Ducre—every two or three weeks—suggests that Dr. Rao is exaggerating her condition. The discharge orders from the hospital as well as the claim log indicate that Ducre is seeing her therapist weekly, and also indicate that she is not seeing her therapist more often because she does not think she can handle it. Ms. Harris advises Mr. Farmer on February 3, 2004 that she (Harris) believes multiple sessions in a week

will promote decompensation, yet Dr. Polsky makes no mention of this explanation in his report. Dr. Polsky states that there is no evidence of homicidal ideation, yet Harris reports to Farmer in February that Ducre states that she wants to hurt someone, which is reported by Mr. Farmer as HI (homicidal ideation) tendencies.  He also states that "it is impossible from the documentation to ascertain actual impairment of her ability to function."  Plaintiff argues that this conclusion completely ignores the clinical assessments of Dr. Rao and Ms. Harris, their observations of her appearance, speech patterns, thoughts, and ability to complete thoughts, and mood.

In continuing her benefits in February of 2004, after a discussion with Ducre's therapist, Mary Ann Harris, during which Harris concretely described the Plaintiffs illness, impairment of memory and concentration, and inability to perform simple daily functions," Farmer writes in the claim log as follows:

> Therapist reports inability to focus or concentrate, HI tendencies not doing ADL's, have to have help from others, poor short-term memory which (precludes RTW as a Customer Service Technician a heavy duty occupation, climbing poles, operating machinery, working near electricity string wire. Ee has hx (history) of electrocution and could possibly be a danger to herself or others at this time.

Her condition, as repeatedly reported by Dr. Rao, does not change between February 3, 2004 and April 26, 2004, as her memory, concentration, and ability to function are still reported as poor by Dr. Rao at the time that her benefits were terminated.

## II. Legal Analysis

### A.    Summary Judgment Standard of Review

Standard summary judgment rules control in ERISA cases.  *Vercher v. Alexander & Alexander Inc.*, 379 F.3d 222, 225 (5th Cir. 2004).  A summary judgment movant must show by affidavit or other evidence that there is no genuine issue regarding any material fact.  *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 325 (1986).  To establish that there is no genuine issue as to any material fact, the movant must either submit evidence that negates the existence of some material element of the nonmoving party's claim or defense, or, if the crucial issue is one for which the nonmoving party will bear the burden of proof at trial, merely point out that the evidence in the record is insufficient to support an essential element of the nonmovant's claim or defense.  *Lavespere v. Niagra Machine & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990), *cert. denied*, 510 U.S. 859 (1993).  Once the movant carries its initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate.  *See Fields v. City of South Houston*, 922 F.2d 1183, 1187 (5th Cir. 1991).

Summary judgment is required if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  FED. R. CIV. P. 56(c); *Celotex Corp.*, 477 U.S. at 322.  In order for a court to conclude that there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could have found for the nonmovant, or, in other words, that the evidence favoring the nonmovant is insufficient to enable a reasonable jury to return a verdict for the nonmovant.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.4 (1986).  In making this determination, the court should review all the evidence in the record, giving credence to the evidence favoring the nonmovant as well as the "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses" and disregarding the evidence favorable to the nonmovant that the jury is not required to believe.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 152 (2000).

**B.     ERISA Standard of Review**

A plan participant who is denied benefits under an ERISA plan can sue to recover them. *See* 29 U.S.C. § 1132(a)(1)(B). This court has jurisdiction to review determinations made by an ERISA employee benefit plan. *Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 295 (5th Cir.1999)(en banc). A Plan Administrator's factual determinations are always reviewed for abuse of discretion; but its construction of the meaning of plan terms or plan benefit entitlement provisions is reviewed de novo unless there is an express grant of discretionary authority in that respect, and if there is such then review of those decisions is also for abuse of discretion. *Vercher*, 379 F.3d at 226.

The Summary Plan Description at issue ("SPD") provides that:

> The Committee and each Claims Administrator and each subcommittee to whom claim determination or review authority has been delegated shall have full and exclusive authority and discretion to grant and deny claims under the Plan, including the power to interpret the Plan and Determine the eligibility of any individual to participate in and receive benefits under the Plan.

Accordingly, Sedgwick's construction of the meaning of Plan terms or Plan benefit entitlement provisions is reviewed for abuse of discretion. *See, e.g., MacLachlan v. ExxonMobil Corp.*, 350 F.3d 472, 478 (5th Cir.2003)("Where a plan administrator has been vested with the discretionary authority to interpret a benefit plan, a district court reviews the administrator's interpretations only for abuse of discretion."). Sedgwick's construction of the meaning of plan terms and its factual findings will be reviewed for abuse of discretion; however, the exact nature of that abuse of discretion review differs depending on whether plan interpretation or factual findings are involved.

A two-step process exists to review "a plan fiduciary's interpretation of its plan." *Ellis*, 394 F.3d at 269. First, a court must determine the legally correct interpretation of the Plan. *Id.* If the administrator did not give the Plan the legally correct interpretation, the court must then determine

whether the administrator's decision was an abuse of discretion. *Id.* at 269-270.  In answering the

first question, i.e., whether the administrator's interpretation of the Plan was legally correct, a court

must consider the following three factors:

> (1) whether the administrator has given the Plan a uniform construction,
> (2) whether the interpretation is consistent with a fair reading of the Plan, and
> (3) any unanticipated costs resulting from different interpretations of the Plan.

*Id.* at 270 (citing *Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 637-38 (5th Cir. 1992), *modified*, 979

F.2d 1013 (1992)).  If the fiduciary's interpretation of the Plan was legally correct, the inquiry is over,

pretermitting any need to consider whether a legally incorrect interpretation of the fiduciary was not

an abuse of discretion.  *Id.*  When considering Sedgwick's Plan interpretation, the Court's review is

not limited to the administrative record, and all evidence presented by the parties may be considered.

*Wildbur,* 974 F.2d at 638.

Plaintiff argues that the Administrator's plan interpretation was an abuse of discretion

because it relied on an excessively narrow interpretation of total disability—that an employee is not

disabled from working due to a mental condition unless he or she is suicidal, homicidal, parasuicidal,

or psychotic.  However, both the initial denial letter, which was primarily based on Dr. Khan's

medical opinion, and the appeal denial letter, which was primarily based on Dr. Polsky's medical

opinion, indicate that the Administrator was relying on the definition of total disability contained in

the SPD when it made its disability determinations.   Indeed, both denial letters repeated the

definition of total disability contained in the SPD verbatim:

> With regard to short-term disability, that because of illness or injury, an Employee
> is unable to perform all of the essential functions of his job or another available job
> assigned by the Participating Company with the same full- or part-time classification
> for which the Employee is qualified.

In deciding Ducre's appeal, Sedgwick was required by ERISA regulations to consult with a health care professional who had appropriate training and experience in the field of medicine involved in the medical judgment. 29 C.F.R. § 2560.503-1(h)(3)(iii).  Dr. Polsky's opinion stated, *inter alia*, that the objective findings support the conclusion that Ms. Ducre is not suicidal, parasuicidal, homicidal [sic], or psychotic."  The Administrator's appeal denial letter repeats this finding to bolster its determination that "from a psychiatric perspective . . . you [Ducre] are not disabled from your regular job." However, the Administrator does not rely on this statement to alter or amend its definition of total disability.

The Court believes that Plaintiff is making the rather intuitive argument that an individual who is not suicidal, parasuicidal, homicidal, or psychotic might still be psychologically disabled to the extent that she cannot perform all the essential duties of her job as a customer services technician who works around high-voltage power lines.   The corollary to Plaintiff's argument is that Sedgwick is hostile to psychological or psychiatric disabilities and imposes a heightened standard for "total disability" on those claimants alleging this type of disability.   In making this argument, Ducre is contesting the Administrator's factual findings relating to whether her psychological disabilities prevented her from performing all the essential functions of her job.  The Court finds that Dr. Khan's and Dr. Polsky's expert reports constituted medical evidence on which the Administrator relied in determining whether Ducre met the definition of total disability contained in the SPD.  The Court will evaluate this evidence when it reviews Sedgwick's factual findings.  The Court believes that the content of Dr. Khan's and Dr. Polsky's expert reports relied on by Sedgwick to deny Ducre's claim are a component of the Administrator's factual findings, not plan interpretation.

This Court's review of Sedgwick's Plan interpretation under the *Ellis* two-prong test is

distinct from the Court's review of Sedgwick's factual findings.  Regarding Sedgwick's factual findings, "[t]he law requires only that substantial evidence support a Plan fiduciary's decisions, including those to deny . . . benefits." *Id.* at 273. "Regardless of the administrator's ultimate authority to determine benefit eligibility, however, factual determinations made by the administrator during the course of a benefits review will be rejected only upon a showing of an abuse of discretion." *Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.*, 168 F.3d 211, 213 (5th Cir.1999)(citing *Pierre v. Conn. Gen. Life Ins. Co.*, 932 F.2d 1552, 1562 (5th Cir.1991)("When reviewing for arbitrary and capricious actions resulting in an abuse of discretion, we affirm an administrator's decision if it is supported by substantial evidence.")).

For the factual findings to be supported by substantial evidence, there need only be a rational connection between the known facts and the decision or between the found facts and the evidence. *See Meditrust*, 168 F.3d at 215 ("A decision is arbitrary only if 'made without a rational connection between the known facts and the decision or between the found facts and the evidence.'" (quoting *Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Mich.*, 97 F.3d 822, 828-29 (5th Cir.1996)). "[R]eview of the administrator's decision need not be particularly complex or technical; it need only assure that the administrator's decision fall somewhere on a continuum of reasonableness—even if on the low end." *MacLachlan*, 350 F.3d at 478 (quoting *Vega*, 188 F.3d at 297).  An Administrator's decision to deny benefits must be based on evidence, even if disputable, that clearly supports the basis for its denial."  *Lain v. Unum Life Ins. Co. of Am.*, 279 F.3d 337, 342-43 (5th Cir. 2002). An arbitrary decision is one made without a rational connection between the known facts and the decision or between the found facts and the evidence.  *Dowden v. Blue Cross & Blue Shield of Texas, Inc.*, 126 F.3d 641, 644 (5th Cir. 1997).

-21-

"The law requires only that substantial evidence support a Plan fiduciary's decisions, including those to deny or to terminate benefits, not that substantial evidence (or, for that matter, even a preponderance) exists to support the employee's claim of disability." *Ellis*, 394 F.3d at 273. Substantial evidence is "more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.*" Id.* If the Plan fiduciary's decision is supported by substantial evidence and is not arbitrary and capricious, it must prevail. *Id.* However, this Court will not "countenance a denial of a claim solely because an administrator suspects something may be awry. Although we owe deference to an administrator's reasoned decision, we owe no deference to the administrator's unsupported suspicions." *Vega*, 188 F.3d at 302.

Fifth Circuit case law supports the position that review of plan interpretation and review of factual findings are analytically distinct. *See Vercher*, 379 F.3d at 222 ("Though we have determined that a legally correct standard was applied, we still must consider whether the facts before MetLife . . . underlying its decision to deny benefits . . . [was] an abuse of discretion.") *See Chandler v. Hartford Life,* 178 Fed. Appx. 365, 369 (5th Cir. 2006)("[A]s the district court noted, Chandler has not challenged Hartford's interpretation of any Plan term . . . . Accordingly, this case turns on Hartford's factual determination that Chander is not totally disabled."); *see Dramse v. Delta Family-Care Disability and Survivorship Plan*, No. 3:05-CV-524-M, 2006 WL 2371334, *3-*5 (N.D. Tex. Aug. 16, 2006)(finding that the administrator's plan interpretation was legally correct, but that the plan administrator's factual findings were an abuse of discretion); *See Leake v. Kroger Texas*, L.P., Civ. A. No. 3:04-CV-2707-D, 2006 WL 2842024, *11 (N.D. Tex. Sept. 28, 2006)(finding that the administrator's plan interpretation was legally correct and then separately analyzing "whether . . .

-22-

the factual findings are supported by substantial evidence.").  Although one Fifth Circuit opinion stated generally that "[t]his Circuit applies a two-prong test when reviewing an administrator's detail of benefits," the dispute in that case focused solely on plan interpretation, not on factual findings. *See Lain v. UNUM Life Ins. Co.*, 279 F.3d 337, 344 (5th Cir. 2002).  Thus, the Court will analyze Sedgwick's plan interpretation and factual findings separately, using the appropriate standard of review.

**C.     The ERISA standard of review is modified when conflict-of-interest exists.**

The existence of a conflict of interest will modify the standard of review in an ERISA case. When a plan administrator's decision is tainted by a conflict of interest, the court employs a "sliding scale" to evaluate whether there was an abuse of discretion. *Robinson,* 443 F.3d at 395. "The greater the evidence of conflict on the part of the administrator, the less deferential [the] abuse of discretion standard will be." *Vega*, 188 F.3d at 297. When the record is sufficient to establish "a minimal basis for a conflict" of interest, the court "review[s] the decision with 'only a modicum less deference than [it] otherwise would.'" *Lain v. Unum Life Ins. Co. of Am.*, 279 F.3d 337, 343 (5th Cir.2002) (quoting *Vega*, 188 F.3d at 301).  When the insurer and the administrator are the same entity, an "inherent conflict of interest" exists. *Robinson,* 443 F.3d at 395 (citing *Lain*, 279 F .3d at 343); *but see Ellis*, 394 F.3d at 270 fn. 18 ("[W]e will not read into Vega a presumption that a conflict exists *ipso facto* merely because the plan fiduciary both insures the plan and administers it.  That an ERISA plaintiff must come forward with evidence that a conflict exists—and that any reduction in the degree of our deference depends on such evidence—belies any duty on our part to make such an assumption.")

A conflicted administrator merits less deference.  *Robinson*, 443 F.3d at 395.  If the plan fiduciary is both the insurer and the administrator of the ERISA plan at issue, under the *Vega*

"sliding-scale approach," both the Administrator's legal interpretation of the Plan and its factual findings[3] must be supported by "some concrete evidence in the administrative record."  *Id.*

AT&T contracts with Sedgwick, an independent third-party administrator, to administer claims under the Plan.  The Plan is self-insured by AT&T, and Sedgwick does not play any role in funding or budgeting for payment of claims. In this case, the plan fiduciary is not both the insurer and administrator of the plan at issue, and Plaintiff has produced no further evidence of conflict. Consequently, the *Vega* sliding-scale approach does not apply in this case, and the Administrator's legal interpretation and factual findings will be reviewed under the traditional abuse of discretion standard applicable to ERISA cases.

**D.    Plaintiff's motion for summary judgment is GRANTED, and Defendants' motion for summary judgment is DENIED.  The Administrator abused its discretion because its factual findings are not supported by substantial evidence in the administrative record.**

The Court finds that Sedgwick's factual findings related to its denial of Plaintiff's short-term disability benefits constituted an abuse of discretion because they are not supported by substantial evidence in the administrative record.  In *Wyatt v. AMEC Choices Benefits Program Long Term Disability Insurance Plan*, Judge Lake of the Southern District of Texas found that the administrator denial of Wyatt's psychological disability claim was arbitrary and capricious.  2005 WL 1186114, *7.  Similar to Ducre's claim, Wyatt's claim was premised on a psychological disability (panic attacks) that prevented Wyatt from performing the essential functions of a physically and mentally

---

[3]Fifth Circuit case law suggests that under the *Vega* sliding-scale approach, both the administrator's legal interpretation of the Plan and its factual findings are reviewed under the less deferential standard if a conflict-of-interest exists.  *See Ellis*, 394 F.3d at 270 (stating that "we apply the sliding-scale standard of review articulated in *Vega* to Liberty's interpretation of its Policy provisions.")(regarding legal interpretation); s*ee Robinson*, 443 F.3d at 395 (finding that "no concrete evidence" supports Aetna's factual findings under the *Vega* "modified abuse of discretion standard")(regarding factual findings).

demanding occupation (oil pipeline contractor). 2005 WL 1186114, *7-*8. The Court finds *Wyatt* to be helpful to the resolution of this case because of several factual and legal similarities between the two cases.

The overwhelming weight of the evidence in this case indicates that Ducre suffered from a severe psychological disability, she was engaged in a physically and mentally demanding occupation, Dr. Khan's recommendation to deny benefits were founded on unsupported suspicions and were not rationally related to evidence contained in the administrative record, and Dr. Polsky's recommendation to deny benefits contained inadequate analysis and ignored overwhelming credible medical evidence to the contrary, especially when viewed in light of Ducre's high physical and mental job requirements. The Administrator has not produced substantial evidence that given Ducre's level of psychological disability, she was able to perform all the essential functions of her occupation as a customer services technician.

The Court will reiterate the entries contained in the administrative record that support the conclusion that Ducre suffered from a severe psychological disability prior to the initial denial of her claim. The severity of Plaintiff's symptoms support the conclusion that she was unable to perform the high physical and mental requirements of her job.

- 1/9/2004: [Evaluation from Laurel Ridge]—Depression: anorexia, dysphoria, insomnia, irritability, agitation, poor concentration . . . Manic: distractability . . . Disruptive behaviors: inattention, impulsivity . . . MSE: impaired judgment, poor insight . . . EE admitted to PHP for depression, unable to function in any job during PHP.

- 1/12/2004: [Discharge from Laurel Ridge]—GAF at discharge: 35

- 1/19/2004: [Therapist Harris Report]—short term memory loss, difficulty with ADLs, can't do errands . . . can't focus on completing simple tasks to take care of herself . . . can't return to work until medically released by attending psychiatrist

- 1/26/2004: [Dr. Rao Report]—having difficulty with focus and concentration and task completion . . . still disorganized and not getting tasks done . . . struggling with daily routine at home . . . in now in outpatient and still very symptomatic . . . is not able to cope with day to day stresses and routine–poor problem solving . . . major depressive disorder, r/o bipolar disorder, generalized anxiety disorder . . . DDG: continues to be disorganized, struggling with her daily routine. [T]his precludes RTW as a Customer Services Technician, heavy duty occupation, driving company vehicle, working with machinery, climbing poles and ladders, stringing wire and working near electricity.  Observed symptoms would possibly present a danger to self or others.

- 2/3/2004: [Therapist Harris Report]—EE reports struggling with every day life, wants to go out and hurt someone. Has no one in mind to hurt and contracts with therapist not to hurt anyone . . . no SI, passive HI [homicidal ideations] . . . Is memory impaired? [Y]es with short term memory. Is ability to concentrate impaired? Poor–has to set EE back on track during session . . . Other observable signs of illness: has mood swings, observed concentration difficulties during session.  Appearance indicates inability to do ADL's [activities of daily living]. Once a week therapy and medication management.  Therapist stated that if EE does twice a week therapy she becomes anxious and promotes decompensation . . . Reported day to day functioning: difficulty getting up in the morning, not doing ADL's, no structure, not brushing teeth or bathing or combing hair every day.  EE requires assistance of her husband and a friend to complete every day activities . . . therapist believes the EE will not be ready for RTW [return to work] before June . . . Therapist reports inability to focus or concentrate, HI tendencies, not doing ADLs, poor short term memory which precludes RTW . . . EE has hx [history] of electrocution, and could possibly be a danger to herself or others at this time.

- 3/9/2004: [Dr. Rao Report]—agitated motor activity, pressured speech, circumstantial thought process . . . short term memory impaired, can't concentrate, repeats questions . . . easily distracted, starts things and doesn't finish things . . . can't finish tasks, difficulty with ADLs . . . Other observable signs of illness: Overflowed bath tub today as fell asleep waiting for tub to fill . . . Needs help cooking, house is a mess, unable to focus on tasks, easily overwhelmed, unable to follow lists . . . unable to return to work at this time due to not functioning at previous level

- 3/9/2004: [Administrator entry]—EE said cannot deal with therapy two times a week as she deals with so much in the once a week session that she does not think she can handle a twice a week therapy.

- 4/5/2004: [Dr. Rao Report]—depression, anxiety disorder, PTSD traits, decreased concentration, increased agitation . . . client struggles to cope and understand daily life events, confused and some intermittent disorientation to place . . . Current ERTW [estimated return to work] plan: not released to work due to impaired functioning.

- 4/21/2004 [Dr. Rao Letter]—I am not returning Kathleen Ducre to work due to her medical

condition of major depressive disorder and generalized anxiety disorder not being stabilized. Mrs. Ducre currently is not able to do her activities of daily living as bathing, eating, sleeping, plus her concentration is severely impaired. Her short-term memory is extremely poor and she has to have family members accompany her to public places and assist her in housecleaning activities. If Mrs. Ducre is returned to work the probability of decompensation is extremely high and there is possibility of additional hospitalization if she is returned to work. Mrs. Ducre is covered under the American Disability Act ("ADA"). It is against medical advice for Mrs. Ducre to return to work.

Ducre's claim was initially denied as of April 26, 2004.  Sedgwick relied on the opinion of its Physician Advisor, Dr. Khan in making this initial denial.  After describing the information on Ducre's psychological condition submitted by Harris and Rao, Khan described a conversation he had with Harris.  He stated the following in his report:

> Her stressors are described to be job-related and also some family issues, which has triggered her "PTSD" symptoms.  The trauma that was described for PTSD is that her husband, who is also working for SBC, applied for short-term disability and later he got fired.  The patient has a fear that she may get fired too . . . . So if appears that she has gotten adequate treatment for her underlying psychiatric symptoms . . . and the main reason that she is not able to go to work is because of the subjective fear of being fired at work, which does not appear to be good enough reason for her to be out on a continued psychiatric disability.  Observational data presented does not support severity of impairment or significant limitation of functioning.

Admin. Rec., D-55, 4/9/2004 Entry.  On April 27, 2006, Sedgwick mailed the denial letter, which referenced Khan's conclusion that Ducre "continue[s] to be in fear of work and the possibility of losing your [Ducre's] job."  Sedgwick determined that the "submitted medical does not support severity of impairment or significant limitation of functioning to perform the essential duties of your job." Admin Rec., D-47, 4/27/2004 Entry.

The Court finds that Dr. Khan's conclusion that "[o]bservation data presented does not support severity of impairment or significant limitation of functioning" is arbitrary and capricious because it was not rationally related to evidence contained in the administrative record.  Rather, the

Court finds that no medical evidence in the administrative record supports the conclusion that as of April 26, 2004, Ducre was capable of performing the essential duties of her occupation as a customer services technician.  Ducre's psychiatrist and therapist repeatedly conclude that Ducre cannot perform the essential functions of her job.  This Court has no reason to disbelieve the uncontradicted evidence in the administrative record: Ducre's severe depression, anxiety, and possible bipolar disorder caused her concentration, memory, and motor skills to be impaired and prevented her from performing her activities of daily living.  The Court also notes that an analysis of whether Ducre could perform discrete tasks required by her occupation is conspicuously absent from Khan's report. The Plan's definition of total disability is fundamentally connected with the claimant's ability to do her job.  The Court is at a loss to understand how an individual who has profound difficulty with concentration, memory, and motor skills can operate dangerous machinery, climb electric poles and ladders, string electric wire and work near high-voltage power lines.  The Court concurs in Sedgwick's initial determination that "[o]bserved symptoms would possibly present a danger to self or others."

By focusing entirely on one statement allegedly made by Harris during their telephone conversation, Khan's report fails to evaluate the mental job performance requirements of Ducre's job.  In *Wyatt*, Judge Lake found that two vocational analyses submitted by Defendant did not support the conclusion that Wyatt could perform the essential duties of his occupation "because they both focused on the physical as opposed to mental job performance requirements."  2005 WL 1186114, *9.  Mr. Wyatt was diagnosed with panic disorder and agoraphobia.[4]  Id. at *3.  Mr. Wyatt

---

[4]Agoraphobia is defined as an abnormal fear of being in crowds, public places, or open areas, sometimes accompanied by anxiety attacks.  Dictionary.com Unabridged (v 1.1). Random House, Inc., http://dictionary.reference.com/browse/agoraphobia.

-28-

initially thought these panic attacks were due to a heart condition and went to the emergency room on several occasions. *Id.* at *1. Symptoms that were suspicious of myocardial infarction were always diagnosed as panic attacks. *Id.* Wyatt had "symptoms on a daily basis to the point that he freezes up and can't function. *Id.* at *2. Wyatt's doctor determined that he would need at least six months to a year of psychotherapy and psychiatric care before returning to his work with "oil companies in some of the most disturbed parts of the world." *Id.* at *3. In this case, Dr. Khan's report contained no analysis of Ducre's ability to perform the mental and physical requirements of her job. In contrast, the medical evidence submitted by Rao and Harris demonstrate that Ducre did not have the physical and mental ability to perform those job functions.

The Court also finds that Khan disproportionately relied on unsupported suspicions in arguing that Ducre is not able to go to work because of her subjective fear of being fired like her husband. Khan never explains why this fear was not merely an expression of the paranoia associated with Ducre's diagnosed anxiety disorder. Furthermore, *Wyatt* held that the Court owes no deference to subjective motive-questioning on the part of the administrator's experts. In *Wyatt*, the Court held that an expert's opinion that the claimant was motivated by an intent to retire and supplement his retirement income with disability benefits was an unsupported suspicion. *Id.* at *8. In *Vega*, the Fifth Circuit stated that "we will not countenance a denial of a claim solely because an administrator suspects something may be awry." 188 F.3d at 302. The undertone of both Khan's and Polsky's report is that Ducre is feigning her symptoms to get disability payments. Khan's disproportionate reliance on the argument that Ducre has a subjective fear of being fired, which was selectively gleaned from a brief telephone conversation, appears motivated by his unsupported suspicion that Ducre is feigning or exaggerating her psychological problems. This conclusion is unreasonable in

light of the symptoms reported by Ducre's psychiatrist and therapist.  His conclusion that Ducre's problems are caused exclusively from a subjective fear of returning to work is an unsupported suspicion.  The Court fully acknowledges that the Supreme Court has rejected a "treating physician" rule in ERISA cases and that an administrator may rely on the opinion of an expert who has not personally examined the claimant.  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).  However, *Nord* also held that plan administrators may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician.  *Id.*  Khan arbitrarily refused to credit claimant's reliable evidence when he myopically focused on a single piece of evidence with questionable probative value in recommending the denial of Ducre's claim.

The Court will now reiterate the entries contained in the administrative record that support the conclusion that Ducre suffered from a severe psychological disability prior to the denial of her claim on appeal.  The Court notes that no substantial progress is reported in Ducre's psychological condition.

•  4/29/2004 [Dr. Rao Report]—is not sleeping well, is agitated, not able to focus or track, is not able to complete simple day to day tasks . . . continues to be totally disabled and is tearful, overwhelmed, is not benefitting from therapy or medications

•  5/18/2004 [Dr. Rao Report]—note 5/17/2004: level of functionality: poor, ability to perform work and daily activities: poor

•  5/25/2004 [[Dr. Rao Report]—letter 5/24/2004: Kathleen Ducre is continuing to be in my care and she sees Mary Ann Harris for individual therapy.  She is continuing to be severely depressed, anxious, overwhelmed, not coping well and is very tearful.  She is not exercising good judgment and is not able to problem solve effectively.  I am extending her disability from May 31, 2004 to Dec. 31, 2004 and with an anticipated date of return to work on 1/1/05.  She will continue seeing Harris every week to see me every 3-4 weeks . . . Progress note 5/24/04: This poor woman is not able to problem solve and gets herself totally overwhelmed.

Sedgwick denied the appeal on June 3, 2004, relying extensively on the opinion of Dr.

-30-

Polsky.  The Court finds that Dr. Polsky's opinions were not rationally related to evidence contained in the administrative record, contained inadequate analysis, and ignored credible medical evidence submitted by Ducre.  Although Polsky states that Ducre's job "is heavy, and requires driving a company vehicle, climbing poles and ladders, stringing wire, [and] working with machinery and near electricity," he does not attempt to explain how Ducre could perform these job functions given the severity of the psychological disabilities reported by Harris and Rao.  After recounting the evidence that was submitted to him, Polsky states that "[f]rom a psychiatric perspective, based on available information, Ms. Ducre is not disabled from her regular job as of 4/26/04 through the present."  Dr. Polsky supports his conclusion with the following four observations: (1) the medical evidence indicates that Ducre is a "depressed and angry woman" whose primary concern is that she may lose her job at SBC Communications, as her husband did after he applied for disability; (2) Ducre's reported inability to perform her activities of daily living is inconsistent with the frequency with which she is being treated; (3) she is not suicidal, parasuicidal, homicidal, or psychotic; (4) she has not provided a formal mental status examination to substantiate her reported problems with memory, cognition, or concentration.  Sedgwick cited these four conclusions in its appeal denial letter.

The reports submitted by Rao and Harris during the administrative process indicated that it would be dangerous for Ducre to attempt to perform the essential functions of her job given her psychological condition.  Although the Court believes that Sedgwick relied on an appropriate definition of total disability, the Court is baffled by Polsky's insinuation that only those individuals with psychological problems making them suicidal, parasuicidal, homicidal, or psychotic would qualify for total disability.  Additionally, Polsky failed to mention that Harris reported on at least one occasion that Ducre was experiencing passive homicidal ideation.  Given the high physical and

mental demands of Ducre's job, it is disingenuous to argue no other psychological disabilities besides those four could qualify her for total disability.

The Court finds that Polsky's report contains inadequate analysis that is not tailored to the specific requirements of Ducre's job or to the specific symptoms that Ducre is experiencing.  In *Wyatt*, the Court criticized reliance on labor market surveys that "neither identify any of the personal safety risks or stresses . . . involved in the job, nor analyze the effect that those risks and stresses can be expected to exert on an individual who, like the plaintiff, suffers from an anxiety disorder . . . . Since plaintiff's impairment is a mental impairment, the exclusion of a question regarding the mental demands of the job precludes the survey from providing relevant, much less substantial, evidence in support of . . . denial of plaintiff's claim." 2005 WL 1186114, at *10.  Polsky makes no attempt to explain how Ducre could perform the essential functions of her job given the symptoms reported by Rao and Harris.  Instead, he implies that Ducre is feigning the severity of her symptoms and is really just scared of returning to work because she might get fired.  This argument is unconvincing and unsupported.  Polsky's report also stated that Ducre "has not been hospitalized, has not been in partial hospital or in a more intensive treatment."  This statement is factually wrong—Plaintiff was admitted to Laurel Ridge Hospital where she was treated in a day treatment program (9 a.m. to 3 p.m.) from December 23, 2003 to January 9, 2004.  Considering the fact that Polsky did not personally interview Ducre and only conducted a paper review of her case, the Court finds this oversight quite significant.

Polsky repeated Khan's finding that Ducre was scared to return to work for fear of being fired like her husband; however, his repetition of Khan's unsupported suspicion does not cure it of the deficiencies discussed previously.  Polsky's argument that Ducre has not submitted formal testing

-32-

substantiating her problems with memory, cognition, and concentration completely ignores the in-person observations and clinical diagnoses of Ducre's treating psychiatrist and therapist, which were contained in the numerous progress reports submitted to Sedgwick.  The frequency and nature of Ducre's treatment was directed by Rao and Harris; however, Polsky argues that Ducre's non-pursuit of aggressive treatment is inconsistent with the severity of her symptoms.  Harris advised Sedgwick on February 3, 2004 that she believed that multiple therapy sessions per week with promote decompensation.  Both the claim log and the discharge order from Laurel Ridge indicate that Ducre was unable to handle participating in therapy more than once her week.  Polsky's conclusion that the severity of Ducre's reported symptoms is inconsistent with the frequency of treatment implies either that Ducre is feigning the severity her symptoms or that Rao's treatment plan is medically inappropriate.  However, the administrative record simply does not support the position that Ducre was engaging in fraud.  Another district court recently evaluated a physician consultant's conclusory assertion that "non-pursuit of aggressive treatment" indicates fraud.  The Court categorized this conclusion as an "unsupported suspicion" because it was not corroborated by medical evidence or treatment analysis.  *See White v. Cyprus Amax Minerals Co.*, No. Civ. A. 04-1188, 2005 WL 711607, *5 (E.D. La. March 22, 2005).[5]  Polsky's conclusion that "it is impossible from the documentation to ascertain actual impairment of her ability to function" is not rationally related to evidence contained in the administrative record describing Ducre's inability to perform her activities

_____

[5]Although the *White* Court ultimately determined that administrator did not abuse its discretion in denying plaintiff's claim because the opinions of other physician consultants were reliable, the Court stated that exclusive reliance on the "unsupported suspicion" of a consulting physician would present a "significant issue" in light of *Vega*.  2005 WL 711607, *5.  The *White* Court cited to *Vega*'s holding that the unsupported suspicion of a consulting physician does not provide a Plan Administrator with substantial evidence to deny a claim.  *Id.*

-33-

of daily living. The Court concludes that Khan's and Polsky's reports do not provide the administrator with substantial evidence on which to base the denial of Ducre's claim. Although this Court cannot impose on the plan administrator a discrete burden of explanation when it credits reliable evidence that conflicts with a treating physician's evaluation, the two expert reports relied on by Sedgwick in this case were not reliable. *See Nord*, 538 U.S. at 834.

Sedgwick failed to refute or even cast doubt on evidence in the administrative record that Ducre could not perform her activities of daily living and had significant problems with concentration, memory, and judgment. The expert reports of Khan and Polsky contained unsupported suspicions, factual errors, and inadequate analysis that did not evaluate Ducre's reported symptoms or her physical and mental job requirements. Therefore, the Court concludes that Sedgwick's factual findings were not supported by substantial evidence in the administrative record.

**E.     Defendants' motion to strike evidence attached to Plaintiff's reply (Docket No. 56) and Defendants' motion to strike evidence attached to Plaintiff's motion for summary judgment (Docket No. 49) are DISMISSED AS MOOT.**

Defendants request the Court to strike Plaintiff's authenticating affidavit and Exhibit Nos. 4, 5, and 8 of Plaintiff's motion for summary judgment (Docket No. 49). Defendants claim that this evidence should be stricken because it is beyond the scope of the administrative record and was submitted after Ducre's administrative appeal was denied on June 3, 2004. Exhibit 4 is a progress note from Dr. Rao, dated June 7, 2004. Exhibit 5 is a copy of the Psychological Evaluation performed by Betsy Bouton Puentes, Psy.D. and approved by Arthur Bouton, Ph.D., which was dated March 30, 2004 but was not submitted to Sedgwick until after June 7, 2004. The Psychological Evaluation from the TRC included a clinical interview, behavioral observations, Wechsler Adult Intelligence Scale – III ("WAIS – III"), Wide Range Achievement Test – 3 ("WRAT – 3"), Beck

Depression Inventory – II ("BDI – II"), and Beck Anxiety Inventory ("BAI"). Exhibit 8 is the Notice of Award from the Social Security Administration, dated August 6, 2004. Defendants also request the Court to strike the Affidavit of Mary Ann Harris (Docket No. 56). This affidavit was attached as an exhibit to Plaintiff's reply to Defendants' response to Plaintiff's motion for summary judgment.

The Court has found that Sedgwick abused its discretion on the basis of evidence submitted by Ducre before her administrative appeal was denied. The Court did not review or rely upon any evidence submitted to Sedgwick after Ducre's administrative appeal was denied, including the evidence that Defendants desire to strike. Consequently, Defendants' motion to strike evidence attached to Plaintiff's reply (Docket No. 56) and Defendants' motion to strike evidence attached to Plaintiff's motion for summary judgment (Docket No. 49) are DISMISSED AS MOOT. The Court did not consider any evidence submitted after Ducre's administrative appeal was denied in reaching its conclusion that Sedgwick's factual findings were not supported by substantial evidence in the administrative record. This Court makes no ruling as to whether documents submitted after an administrative appeal is denied may subsequently be considered in a district court's ERISA review.

### III. Conclusion

Plaintiff's motion for summary judgment is GRANTED (Docket No. 43), and Defendants' motion for summary judgment is DENIED (Docket No. 38). Defendants' motion to strike evidence attached to Plaintiff's reply (Docket No. 56) and Defendants' motion to strike evidence attached to Plaintiff's motion for summary judgment (Docket No. 49) are DISMISSED AS MOOT. The Court concludes that the Administrator's factual findings relating to its denial of Plaintiff's claim for short-term disability benefits constituted an abuse of discretion. Plaintiff's motion for summary judgment is granted as to her application for short-term disability benefits only. Plaintiff's administrative

remedies have not been exhausted as to her claim for long-term disability benefits.  Plaintiff is ORDERED to submit additional briefing on damages and attorney's fees by **January 29, 2007.**  The remaining deadlines contained in the Court's Scheduling Order are VACATED.  Defendant should respond to this briefing within eleven days of service.  *See* Local Rule CV-7(d).  The Court will enter judgment on a separate document pursuant to Rule 58 after considering this additional briefing.

It is so ORDERED.

SIGNED this 12th day of January, 2007.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE